Per Curiam:
Pursuant to former Buie 45(a) (now Buie 57 (a)), this case was referred to Trial Commissioner Donald E. Lane with directions to make findings of fact and a recommendation for the conclusion of law. The commissioner has done so, supported by an opinion filed on June 7,1963. The plaintiff has excepted to the commissioner’s recommendation for the conclusion of law to be entered and to certain of his findings of fact. Defendant has also excepted to the commissioner’s failure to make certain findings. The parties *471 have filed briefs and the case has been argued orally. The court agrees with the commissioner’s findings, his opinion, and his recommended conclusion of law as hereinafter set forth, and hereby adopts the same as the basis for its judgment in this case. In accordance therewith, the court concludes as a matter of law that claim 5 of United States Letters Patent No. 2,718,568 is invalid. Judgment is entered to that effect and plaintiff’s petition is dismissed.
OPINION OP COMMISSIONER
This is a claim for compensation under 28 U.S.C. § 1498, for the unauthorized use and manufacture by and for the United States of a patented invention.
The subject matter of this case concerns a rotary relay disclosed in United States Letters Patent 2,718,568, granted to Connecticut Valley Enterprises, Inc., September 20,1955, on an application by Brock A. Somers. The patent disclosure, the patent claim in suit, and the accused relays used by the defendant are described in the accompanying findings of fact. The several issues of law involved are discussed in the following comments.
One of the important issues raised by the proofs in this case is, under what circumstances may a device which has been developed by another prior to the invention by the patentee, be considered as a part of the prior art for the purpose of invalidating the patent. Struthers-Dunn, Inc., one of defendant’s suppliers, had developed three relays which were either anticipatory or had important anticipatory features of the patent in suit prior to the invention date of the patentee. One of these, the #212 relay (defendant’s exhibit 61), was tested and approved by a prospective purchaser, and was the object of an intensive sales effort with respect to that purchaser, prior to the invention by the patentee. Another, the #220 D.C. relay (defendant’s exhibits 57, 58 and 10), was being sold and was in mass production prior to the invention by the patentee. The third, the #220 A.C. relay (defendant’s exhibits 8 and 88), had been developed and tested by Struthers-Dunn, and a sample had been delivered to the Air Force prior to the invention by the patentee. A fourth relay, a modified #212 *472 relay (defendant’s exhibit 60), was also developed by Struthers-Dunn, Inc., under a government contract at about the time of the patentee’s invention; however, the evidence does not establish that this relay was developed prior to the patentee’s invention. The pertinent statute governing this issue is 35 U.S.C. § 102, which reads in part as follows:
A person shall be entitled to a patent unless — (a) the invention was known or used by others in this country, * * * before the invention thereof by the applicant for patent, * * * .
This court has set forth that the burden of proving the facts of a prior knowledge defense is on the defendant and every reasonable doubt must be resolved against him. Badowski v. United States, 143 Ct. Cl. 23, 164 F. Supp. 252, 118 U.S.P.Q. 358 (1958). In the instant case the defendant has met the burden with clear and convincing evidence of operable anticipatory devices which were accessible to the public prior to the Somers invention.
The prior knowledge or use must be of a complete and operative device. Mere acquaintance with the invention is not enough if there is no reduction to practice. Badowski v. United States, supra; Block v. Nathan Anklet Support Company, Inc. 9 F. 2d 311 (2d Cir. 1925); Coffin v. Ogden, 85 U.S. (18 Wall.) 120 (1873). However, the mere fact that the device was made in a laboratory or the like is not a reason for classifying the work as an experiment as opposed to a reduction to practice as long as the device is made so as to have practical utility. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358 (1928). Once a device is actually built satisfactorily for the intended purpose, it is more than an experiment and is a part of the prior art even if it is later abandoned. Buser, et al. v. Novelty Tufting Machine Co., 151 F. 478 (6th Cir. 1907). The #212, #220 D.C. and #220 A.C. relays were each completely constructed and tested sufficiently to demonstrate their utility as relays prior to the invention of the patentee, and thus each of these relays may be considered as properly reduced to practice at that time. The modified #212 relay, though reduced to a drawing prior to the invention of the patentee, was not completely constructed at that time due to problems in ob *473 taining a proper material for the header. Thus, the modified #212 relay was not reduced to practice prior to the time of the patentee’s invention and may not be considered as a part of the prior art for the purposes of showing lack of novelty in the patentee’s device.
The prior knowledge or use in order to negative novelty must also be accessible to the public. The leading case in support of this proposition is Gayler v. Wilder, 51 U.S. (10 How.) 477 (1850), in which it was held that a safe containing certain non-evident construction features, which was used by the builder and then sold to a purchaser who was not informed of the non-evident features, was not a device which could be relied upon as prior knowledge, since the knowledge was not accessible to the public. Even if the nature of the device is such that the contested features are evident from the device itself, the prior knowledge will not be anticipatory if it has been kept secret by an actual and deliberate effort. However, mere exclusion of the public from the factory is not secrecy if use of the device is made in the factory in the regular course of business. Standard Automatic Mach. Co., v. Karl Keifer Mach. Co., 18 F. 2d 326 (S.D.N.Y. 1925), affirmed 18 F. 2d 381 (2d Cir. 1927). The #212 and #220 D.C. relays clearly meet these requirements since they were openly made in the factory in the regular course of business and were freely shown to prospective customers. The #220 A.C. relay also meets these requirements since it was openly made in the factory and a working sample was delivered to the Air Force. The fact that each of these three relays is customarily mounted with its working parts in a nontransparent container should not serve to confuse this case with the problem of Gayler v. Wilder, supra. In the instant case the relays were sold or delivered to persons who were actively interested in the construction of the relays, and it maybe logically assumed that they investigated the relays sufficiently to ascertain their exact construction. The modified #212 relay here again does not meet the requirements for prior knowledge since it was maintained as a secret under a “restricted” security classification. With regard to the #220 A.C. relay, a recent case held that submission of a report to a Govern *474 ment agency was not enough alone to constitute prior knowledge. Rem-Cru Titanium,, Inc. v. Watson, Commissioner of Patents, 152 F. Supp. 282 (D.D.C. 1957), 114 U.S.P.Q. 529. That case is distinguished on its facts since there the prior knowledge was a written document as opposed to a completed device. The District Court based its decision on the rule of law governing the date on which an article submitted to a publisher is deemed to have been made public.
Finally, prior knowledge or use in order to negative novelty must be of the same device from a patentability viewpoint with a clear identity between the prior knowledge or use and the patentee’s invention. Greenwald Brothers v. La Vogue Petticoat Co., 226 F. 448 (2d Cir. 1915). It is not necessary that the prior knowledge be of the identical device if the differences between the patented device and the prior art device are not patentable distinctions. Pennington v. National Supply Co., 95 F. 2d 291 (5th Cir. 1938), 37 U.S.P.Q. 18. There is a clear identity between the #212 relay and the principles of the Somers relay. The only differences between the #212 relay and the Somers relay are minor and such as would not amount to a patentable distinction. As will be discussed in more detail below, the #220 D.C. and A.C. relays actually anticipate one of the features of the Somers relay which is different from the #212 relay. Thus, even if this difference is treated as a patentable distinction, the #220 D.C. and A.C. relays negate its novelty.
A separate issue has been presented regarding the allegation that even if the Struthers-Dunn #212, #220 D.C. and #220 A.C. relays are considered as proper members of the prior art, the distinctions between these relays and the Somers patent relay still amount to a patentable invention. As noted in finding 26 below, there are two differences between the #212 relay and the Somers relay, namely, (1) the #212 relay has only one set of switching mechanisms, whereas Somers claim 5 requires a plurality of duplicate sets of switching mechanisms; (2) the #212 relay has the armature on substantially the same level as the pair of terminals and the spring contact member, whereas Somers claim 5 recites terminals and spring contact members as being in the space between the armature and the support member. Eeferring *475 to the first distinction, it has been held that duplication of a part from a known device in a subsequent device does not of itself make the subsequent device patentable. Alco Kar Kurb, Inc. v. Ager, 286 F. 2d 931 (3d Cir. 1961), 128 U.S.P.Q. 269; Bryan v. Garrett Oil Tools, Inc., 245 F. 2d 365 (5th Cir. 1957), 114 U.S.P.Q. 10; Lewis E. Hamel Co., Inc. v. P & K, Inc., 185 F. Supp. 278 (E.D. Ill. 1960), 126 U.S.P.Q. 103. This difference is clearly of the type which would be within the purview of one having ordinary skill in the art, and hence would fall within the prohibition of 35 USC § 103, which reads in part as follows:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.
Turning now to the second distinction, again it would be obvious to one having ordinary skill in the art to raise the armature sufficiently to allow the pairs of terminals and the spring contact member to lie in the space between the armature and the support member. The prior art actually suggests this arrangement when it is desired to place more than two sets of switching mechanisms on the relay. This arrangement is shown in the Struthers-Dunn #220 D.C. and A.C. relays, the Cole patent, and the Lazich patent. It would not require invention, for one having the above-mentioned prior art before him, to modify the Struthers-Dunn #212 relay to eliminate the differences between it and the Somers relay. It is found that claim 5 of the Somers patent is anticipated by the prior art and is invalid.
A further issue was presented regarding the interpretation of an ambiguous term in a claim. Claim 5 recites fingers “secured at opposite sides” of the armature. This term “sides” may be interpreted in several ways, each of which is consistent with the specification and drawings of the patent. In such a situation, it is proper to refer to the application file of the patent to determine what meaning should be given to the term. Goodyear Dental Vulcanite Co. v. *476 Davis, 102 U.S. (12 Otto) 222 (1880); Mall Tool Co. v. Quaker Vibrators, Inc., 30 F. Supp. 841 (E.D. Pa. 1939), 43 U.S.P.Q. 506. As is pointed out in findings 35 and 36 below, a study of the application file indicates that the meaning intended by the patentee and the examiner for the term “sides” in claim 5 was sides as opposed to top, bottom, or ends. Hence, this is the meaning which must be imparted to the term in this suit.
Another issue presented in this case is the breadth or scope to be accorded patent claim 5 even if it were found to be valid. Specifically, claim 5 requires that the relays have “fingers secured at opposite sides of the armature.” Plaintiff alleges that the exact location of the fingers is not the inventive feature of the claim, and hence the defendant should not be able to avoid infringement merely by placing the fingers on the top, bottom, or ends of the armature. The Somers patent, which is not for a pioneer type invention, is located in a crowded art. The claims have been restricted during prosecution to distinguish over the prior art disclosures cited by the examiner. In such a situation the claims must be narrowly construed, and the limitations and restrictions must be considered as necessary and material. Connecticut Paper Products, Inc. v. New York Paper Co., 127 F. 2d 423 (4th Cir. 1942), 53 U.S.P.Q. 271. If a valid patent issued, contrary to the findings herein made, then it must be limited to the precise structure disclosed and claimed. Simmons Co. v. A. Brandwein & Co., 250 F. 2d 440 (7th Cir. 1957), 115 U.S.P.Q. 307. Somers claim 5, even if it were valid, must be restricted to covering only relays in which the fingers are secured at opposite sides of the armature.
FINDINGS OF FACT
1. This is a patent suit under the provisions of 28 U.S.C. § 1498. Plaintiff seeks to recover reasonable and entire compensation for the unauthorized use and manufacture by and for the United States of rotary relays described in and covered by United States Letters Patent No. 2,718,568, granted to Connecticut Valley Enterprises, Inc., on September 20, 1955, based on an application by Brock A. Somers, filed August 19, 1952.
*477 2. This suit was commenced on October 26,1957, with, the S. H. Couch Company, Inc., as co-plaintiff. On October 9, 1961, the court allowed defendant’s motion to dismiss the S. H. Couch Company as co-plaintiff.
3. Connecticut Valley Enterprises, Inc., hereinafter referred to as OVE, is a corporation organized and existing under the laws of the State of Connecticut, and has a place of business at the Biverside Trust Company Building, Essex, Connecticut, and, as assignee, has owned the Somers patent continuously since its issuance.
4. The parties agreed at pretrial to a separation of issues for trial, that the issues of validity of the patent and of infringement of the patent by the defendant be first determined upon full proofs, findings of fact, and argument of counsel, and that any accounting issue be deferred.
5. An electrical relay is a device for controlling a flow of electricity in response to some signal. In particular, an electromagnetic relay is an electrical relay which is controlled by the magnetizing effect of an electrical current. The principle of operation of all electromagnetic relays is virtually identical. Fundamentally, all electromagnetic relays comprise an electrical conductor which is wound around a soft iron frame. A movable armature is provided to complete the magnetic circuit around the soft iron frame. The armature cooperates with and is connected by some mechanical means to an electrical switch or switches. When electrical current is passed through the electrical conductor, magnetic flux is caused to pass through the framework of soft iron which results in movement of the armature and operation of the electric switch. In the electromagnetic circuit of a relay, it is acceptable to use one, two, or more electrical coils, and the number of coils is purely a matter of engineering choice. The term header is used in the relay art to describe a structure by which electrical connections are brought to the outside of a relay. It is a base element on which the fixed and movable contacts may be mounted. The electrical connections for the fixed and movable contacts are brought through the header and are sealed off from the outside by the header.
6. The first electromagnetic relay was made in the United *478 States by Morse in 1824. It weighed 300 pounds. Since that time the number of different types of relays has grown tremendously. The basic elements of an electromagnetic relay have been in the public domain almost as long as the first relay itself. Since 1915, and probably longer, can or cylindrically shaped (cup and core) magnetic and U-shaped magnetic structures have been available to the relay engineer. Electrical terminals, movable contacts, and mechanical means which shift a movable contact into or out of engagement with an electrical terminal have been the tools of relay designers for at least 50 years. Electromagnetic relays have long been used to switch an electrical circuit in response to some signal in a variety of devices, such as dishwashers, automatic laundries, and automobiles. Historically, relays for conventional environments were designed by taking into account the requirements of the relay motor and the switching assembly or, where possible, by simply modifying an old relay. The switching operation to be performed determines the number and arrangement of electrical contacts, and the available source of power determines the coil arrangement and the magnetic circuit. In the design of conventional relays for ordinary uses, it is possible and customary to substitute and interchange various types of magnetic circuits with various switching arrangements. This type of substitution and selection is a relatively simple thing. Little skill is required to decide which one of several hundred operating mechanisms should be combined with which one of perhaps thousands of contact combinations to give the customer a relay for a particular environment and use.
7. Conventional relays such as those used in automobiles, buses, and trains, are subjected to mild amounts of acceleration, but with the advent of high performance jet aircraft and even more so with the coming of the missile age, extraordinary environments and conditions were encountered. The rapid and tremendous increases in linear accelerations that jet aircraft and missiles are subjected to create great counter forces which the relay must be able to withstand. High humidity and high altitude environments also made hermetic sealing of relays a necessity. Defendant, when it realized the shock and vibration problem in relays could not be solved *479 by conventional relays, began searching, primarily through the Department of the Air Force, for an improved relay that would operate reliably under the tough new environmental conditions. It is known that in 1948 and 1949 defendant recognized the dire need for improvement in relays and awarded a series of R & D contracts to various relay manufacturers in an effort to achieve a solution to the problems created by the new environments. Struthers-Dunn, Inc., and Hart Manufacturing Company were among the manufacturers receiving the R & D contracts.
8. In March 1950, Robert F. Meyers, now president of CVE, took a management consultant assignment with Hart Manufacturing Company. He subsequently became vice-president and general manager and served as a member of the board of directors. While with Hart, Meyers’ duties included overall supervision of all phases of Hart operations, including finance, engineering, production and sales, and he became familiar with the previously described Hart contract which was put on a crash basis. Brock A. Somers, the inventor of the patent in suit, came to Hart about June 5, 1950, and while with Hart, Somers acted as a production engineer. He was responsible for assisting the Hart production department in engineering tool design and in setting up the plant to produce items in quantity. Both Meyers and Somers left Hart in April of 1951. Sometime between Christmas and New Year’s Eve, 1951, Meyers and Somers decided to form CYE to develop and market new products. In January of 1952, CVE was formed.
9. At the start, Somers and Meyers were CYE’s sole employees. At first they worked on various products such as vibration analyzers, a camera lens, and an oil tank gauge. They soon dropped these projects, however, and began devoting their efforts to the development of a high performance military type relay. Somers and Meyers set as a target date for the completion of a high performance military relay the Institute of Radio Engineers Show (IRE Show) that was scheduled for March 3-6,1952, in NewYork City.
10= Meyers and Somers succeeded in building two complete relays according to Somers’ design by using makeshift equipment, such as a lathe and drill press adapted with *480 a milling cutter in Somers’ basement. These relays were constructed only in time for Meyers and Somers to present them on the last day of the IRE Show on March 6, 1952. The two relays which were taken to the IRE Show were of the 2-pole variety; one had the can or outer casing on and the other one had the can or outer casing off. These relays were freely disclosed and shown to the persons in attendance and were available to representatives of the many relay manufacturers who were present, and to potential customers, engineers and sales representatives. During the course of the IRE Show, Meyers and Somers received orders for 150 relays and engaged a sales representative for the New England area. When Meyers and Somers returned from the IRE Show, they were able to obtain additional capital for CVE and to hire additional personnel. One of the original CYE relays that was taken to the IRE Show was given to CVE’s patent attorney to aid in preparation of a patent application. This application was filed on August 19,1952, and ultimately matured into the patent in suit.
11. The Somers patent, No. 2,718,568, which is the subject of this litigation, relates to an electromagnetic relay constructed in such a manner that the armature will not be affected by outside forces, such as the force of acceleration, when the relay is mounted in a moving object. The patent teaches a relay having an armature mounted to rotate about an axis with the armature being so designed that it will be substantially balanced about this axis. The forces of acceleration act equally upon the portions of the armature on each side of the axis, and, as a result, the forces of acceleration have no effect upon the movement of the armature. The patent contains six illustrative drawings which are reproduced herein. These drawings represent six views of the same relay and are broadly described by the patentee as follows:
Fig. 1 is a front elevational view of a relay embodying my invention, the casing or cap being shown in dotted lines;
Fig. 2 is a side elevational view thereof, the casing having been removed;
Fig. 3 is a sectional view on line 3 — 3 of Fig. 1;
Fig. 4 is a sectional view on line 4 — 4 of Fig. 2;
*481 Fig. 5 is a view similar to Fig. 4 showing the armature in another position; and
Fig. 6 is a view of the armature of the relay magnet.

12. Referring particularly to fig. 1, the cover or can 11 is supported on a base or header 10 which serves to support the relay structure. Eight terminal posts, 20, 21 (fig. 2), 28 (fig. 4), 24, 25, 27 (fig. 3), 29, and 30, project through the header 10 in such a manner that their lower portions may *482 be connected to sources of power or electrical devices, and their upper portions provide a series of terminals for use in the relay. These upper terminals may best be seen in figs. 4 and 5. An electromagnet having a U-shaped core 15, with spaced parallel legs 16 and 17, and a coil 14, is mounted on a nonmagnetic U-shaped bridge member 12 which, in turn, is mounted on header 10. A magnetic armature 34 is pivotally mounted between the parallel legs 16 and 17 of electromagnet core 15 by means of a pivot pin 33 which is secured at its lower end in bridge member 12 and at its upper end in a bridge member 32 which spans the space between parallel legs 16 and 17 of electromagnet core 15 at a point just below coil 14. This arrangement is best shown in figs. 1 and 3. Thus, it may be seen that armature 34 is located between the legs of the electromagnet and is spaced a short distance above the upper surface of header 10. L-shaped arms 40 and 41 (fig. 2) are mounted on the sides of armature 34, one on each side of pivot pin 33. One end of each of arms 40 and 41 projects downwardly toward header 10 and terminates in a bead of insulating material indicated by numerals 42 and 43 in fig. 4. Spring contact members 26 and 28 are mounted on two of the terminals, 25 and 27, on the upper surface of header 10. The free end of each of spring contact members 26 and 28 extends across the face of header 10 beneath armature 34 to a position between two adjacent terminals on the header 10. As illustrated in figs. 4 and 5, spring contact member 26 is mounted on terminal 25 and extends across the face of header 10 to a position between adjacent terminals 23 and 24. Similarly, it may be seen that spring contact member 28 is mounted on terminal 27 and extends across the face of header 10 to a position between adjacent terminals 29 and 30. These spring contact members, which are made of an electrical conducting material and are spaced vertically from both header 10 and bridge 12, are biased into contact with one of the two adjacent terminals at their free ends. The spring contact members are positioned so each is adjacent one of the beads 42 and 43. The two remaining terminals 20 and 21 are connected directly to coil 14 for supplying current thereto.
13. In operation, the relay acts as a switch. Normally *483 there will be no current flowing through the terminals 20 and 21, and thus the electromagnet is not energized. In this condition, which is illustrated in fig. 4, current flowing into terminal 25 will flow through spring contact member 26 to terminal 24, and similarly current flowing into terminal 27 will flow through spring contact member 28 to terminal 29. Thus, an electric circuit is made running from a source of power to the input terminal (25 or 27), through the spring contact member (26 or 28), out the output terminal (24 or 29), through the electrical device to be operated and back to the source of power. When it is desired to switch the current from the electrical devices connected to terminals 24 and 29 to electrical devices connected to terminals 23 and 30, coil 14 is energized by passing a current from a source of power through input terminal 20, through coil 14, through output terminal 21, and back to the source of power. The energizing of the coil 14 causes the core 15 to become an electromagnet, and the electromagnetic forces in the legs 16 and 17 of the core 15 attract armature 34 causing it to pivot counterclockwise about pin 33 until the ends of the armature are closely adjacent to the legs of the core. In pivoting, the armature moves arms 40 and 41, and hence causes insulated beads 42 and 43 to overcome the bias of the spring contacts 26 and 28 sufficiently to force the springs out of contact with terminals 24 and 29, respectively, and into contact with terminals 23 and 30, respectively. This latter condition is shown in fig. 5. "When the relay is in this condition the current flowing through terminals 25 and 27 flows through spring contacts 26 and 28, respectively, to terminals 23 and 30, respectively, and through the electrical devices connected to these last-mentioned terminals. Thus it may be seen that the relay illustrated may be used to switch current from one pair of terminals (and indirectly from one pair of electrical devices) to another pair of terminals (and indirectly to another pair of electrical devices). When it is desired to return the relay to its normal condition, all that is necessary is to discontinue the current to coil 14. This will cause the electromagnet to become de-energized and the attraction of the legs of core 15 for the armature 34 will cease. With no force holding the armature *484 to the legs of the core 15 the biased spring contacts 26 and 28 will break contact with terminals 23 and 30 and return to their normal positions in contact with terminals 24 and 29. This movement of the spring contact members will cause arms 40 and 41 to pivot armature 34 clockwise about pivot pin 33, until the armature is in its normal fig. 4 position again.
14. The Somers patent contains six claims, of which only claim 5 is here in suit. Claim 5 is reproduced below in lettered clauses to facilitate understanding the combination of elements recited.
An electrical relay comprising
fa) a supporting member,
(b) a U-shaped electromagnet carried by said member, said magnet comprising a pair of spaced substantially parallel opposing poles having free end portions extending toward and fixedly secured at one face of said supporting member,
(c) an armature rotatably mounted between the magnet poles on the same side of said supporting member as the magnet and extending at right angles to its axis of rotation with the ends of the armature extending toward the opposing magnet poles, said armature being mounted in spaced relation to the supporting member, and on an axis substantially parallel to the magnet poles, *and said armature being substantially balanced about its axis, [*For convenience, this last phrase is transposed here from the end of the claim.]
(d) a plurality of pairs of terminals carried by the supporting member in the space between it and the armature,
(e) a plurality of spring contact members each of which is fixed at one end with respect to the supporting member and has its free end extending between and being biased toward one of a pair of terminals, said contact members lying between the armature and the supporting .member,
(f) fingers secured at opposite sides of the armature and extending toward the supporting member, each of said fingers being adapted to engage one of said spring contact members to move the latter into engagement with the other of said pair of terminals when the armature is rotated, * * *.

*485

British patent 572,686
15. Referring to the application file of the Somers patent, the examiner cited six prior art disclosures. The most pertinent of these prior disclosures is British patent 572,686 for *486 “Improvements in. and relating to Shock Resisting Relays and Switches.” As shown in figs. 1, 2 and 3 reproduced herein, the British patent relay is comprised of a base plate 1 on which are mounted two pairs of fixed terminal pins 11 having connecting loops 12. Extending between each pair of the terminal pins is a resilient contact member 9 having a connecting loop 10. A U-shaped magnet 2 is provided wherein a core 3 is on the opposite side of base plate 1 from the contact terminals 11, and the magnet poles 5 extend through base plate 1 to the contact terminal side. An armature 8 is mounted on pivot pin 7 between the poles 5. Projecting outwardly from the two ends of the armature 8 are arms 13 carrying forks 14 which engage with contact members 9. Poles 5 are attached to the ends of core 3 by means of end plates 4 which serve to offset and stagger the poles so that they pass through base plate 1 at the diagonal corners thereof. Somers’ attorney argued to the examiner that claim 5 of the Somers patent, which was claim 23 in the application, differs from the British patent in that the claim calls for the armature to lie on the same side of the supporting member as the magnet and also calls for the poles of the magnet to oppose each other, whereas in the British patent the armature lies on the side of the supporting member opposite the magnet, and the poles are staggered. In addition, Somers’ attorney pointed out that claim 5 calls for the armature to be mounted in spaced relation to the supporting member, with the terminals and the spring contact members lying in the space between the armature and the supporting member, and for the fingers to extend toward the supporting members, whereas the British patent has the terminals and spring contact members beside the armature and has the fingers extending away from the supporting member. The remaining patents cited in the application file relate to various features of the Somers relay, but are not sufficiently pertinent to warrant further dicussion here.
VALIDITY ISSUE
16. The defendant urges that claim 5 of the Somers patent is invalid in view of the prior art. In support of this contention, the defendant relies on three United States patents, *487 two specific prior devices, and indirectly on the application file of the Somers patent.
17. The Somers relay, which was shown at the IRE Show, and from which the patent drawings were made, contains each and every element and limitation of claim 5. The Somers patent is entitled to an invention date of not later than March 6,1952.
18. The Cole patent 2,428,784 which issued on October 14, 1947, discloses a magnetic motor starting switch. Referring to figs. 1-5, which are reproduced herein, the Cole switch includes a U-shaped magnet 22 having legs 21 secured to a support member 20, the legs 21 being substantially parallel and extending from opposite ends of the energizing coil 24. An armature 27 is rotatably mounted midway between its ends on pin 25 and the same side of support member 20 as the magnet and extends at right angles to its axis of rotation with the ends of the armature extending toward the opposite poles of the magnet. Movement of armature 27 controls a snap switch mechanism supported in the space between the armature 27 and the member 20. The switch mechanism includes a termminal contact 37 carried by support member 20 and a movable contact 36 carried by member 29 which is moved by means of a finger 46 carried by and extending from armature 27. Finger 46 engages member 29 through a link 43 and spring 45. The Cole construction differs from the relay of claim 5 in that the Cole armature is not balanced in the sense that the Somers armature is balanced, and Cole does not disclose the elements of clause (e) of claim 5, i.e., a spring contact member which is fixed at one end with respect to the supporting member and has its free end extending between and being biased toward one of a pair of terminals.
19. The Lazich patent 2,775,666 issued December 25,1956, on an application filed April 19, 1951, and relates to a small, hermetically sealed relay capable of withstanding severe shocks and temperature changes. Referring to figs. 2, 3, and 4 reproduced herein, the Lazich relay includes a supporting member 39 at the top for a plurality of terminals 43' which carry contact springs 49. These springs 49 carry

*488

COLE PATENT
2 , 4 2 8 , 7 8 4
contacts 51 which, operate between stationary contacts 47. There is an inherent bias tending to hold the contacts 51 in the position shown in fig. 3. The Lazich magnet is a can type having a coil 17, four pole pieces 27, and core 5. A balanced armature 29 is rotatably mounted above and coaxial with core 5, which projects into a recess in armature 29 and acts as one pole of the magnet. The pole pieces 27 act as the other pole of the magnet. A spider 35 is secured to armature 29, and the upturned rim 41 of the spider 35 is notched at various points 42 to engage the outer

*489

LAZICH PATENT
2,775,666
portions of contact springs 49. In operation, when coil 17 is energized, armature 29 rotates counterclockwise to engage the poles 27, and upturned portions 41 of spider 35 move the contact springs 49 to transfer the movable contact points 51 from the one set of fixed contact points to the other set. When the coil 17 is de-energized, the bias of the contact springs returns contacts 51 and armature 29 to the position shown in figs. 3 and 4. The Lazich relay differs from the relay of claim 5 in that the Lazich magnet is not U-shaped and the armature, which is circular, does not extend toward *490 the opposing magnet poles in the sense set forth in clause (c) of claim 5.
20. The Hall et al. patent 2,767,280 issued October 16, 1956, on an application filed April 29, 1952. The plaintiff has conceded, for the purpose of this case, that defendant would have been able to establish by proper proofs that the invention of the Hall relay had been completed prior to Somers5 invention date of March 6, 1952. Referring to figs. 1, 2, 3, and 11, reproduced herein., the relay disclosed in the Hall patent includes a base plate 110 (illustrated in fig. 11) having mounting studs 116 attached thereto. The base plate 110 carries a header comprising a cylindrical shell 120, a plurality of terminals 122, and a molded vitreous seal 124. The Hall U-shaped magnet has cores 24 and 26 (illustrated in fig. 1) extending away from the base plate. Mounted on the bracket 50 (illustrated in fig. 2) are vertical plates 64 on which contact assemblies 62 are provided. Each contact assembly includes stationary contacts 68 and 70 and a movable contact 72 carried on an arm 74. The balanced armature 54 is pivotally mounted adjacent the ends of the cores 24 and 26 and carries a pair of arms 100 having fingers 106 at the ends thereof which engage the upper ends of movable contact arms 74. When mounted in the can 112, as shown in fig. 11, the Hall relay is confined against endwise movement due to engagement of the member 58 with the top wall of the can, and engagement of the bottom strap 46 with the studs 114 contacting the upper surface of the base plate 110. The Hall relay differs from the relay of claim 5 of the Somers patent in that'the free ends of the poles of the Hall magnet extend away from the support member rather than toward it. The support member, in the sense in which the term is used in the Somers patent, refers to the Hall base plate 110 which supports the relay structure. The Hall relay terminals and spring contact members do not lie in the space between the supporting member and the armature, nor do the fingers extend toward the supporting member.
21. The following additional patent and publication disclosures have been discussed in the presentation of this case, but their teachings are either cumulative of features shown

*491

HALL H At PATENT
2 , 7 6 7 , 2 8 0
in the patents discussed above or are not considered sufficiently pertinent to warrant further analysis here:
Hill patent_ 1,167,067
Adams et al. patent_ 1,366,601
Leake patent_ 1,696,170
Mead patent_ 1,763,003
Volkman et al. patent_ 1,767,104
Daly patent_ 1,839,377
Leake patent_ 1,852,423
Agnew patent_ 2,162,903
Leach patent_ 2,246,739
Eaton patent_ 2,344,809
Horman patent_ 2,393,535
Weber patent_2,413,397
Skrobiseh patent- 2,422,861
Langer patent_ 2,445,401
Ashworth patent_2,510,305
Horlacher patent- 2,790,939
*492 Components Handbook edited by John F. Blackburn for the Office of Scientific Research and Development, National Defense Research Committee (1949), pp. 467-474.
22. Struthers-Dunn, Inc. developed two relays identified as the #220 A.C. and #220 D.C. relays. The #220 D.C. was a direct current relay, and a substantial number were sold prior to March 1952, by which time this relay was in mass production. This D.C. version of the #220 relay is shown in a partial drawing in evidence as defendant’s exhibit 57. Two models of this relay slightly modified in a manner not here pertinent are in evidence as defendant’s exhibits 58 and 10. The #220 D.C. version is a 6-pole, double-throw relay with a cup and core magnet in which the cup portion also forms the can or outer cover for the relay. The rotatable armature is balanced about its axis and is mounted directly beneath the coil. A pair of fingers extends downwardly from the armature and engages a circular plastic disk. Spring contact members in turn extend downwardly from the disk toward the header. Rigid contact pins are affixed on the free end of each of the spring contact members and extend horizontally from the spring contact members to a position between a pair of upstanding fixed contact pins which are mounted on the header. This D.C. version of the Struthers-Dunn #220 relay differs from the relay described and claimed in Somers claim 5 in that it has a cup and core type magnet rather than a U-shaped magnet. The #220 relay spring contact members do not extend between a pair of terminals as set forth in claim 5, but require an attached rigid horizontal contact pin to engage the fixed contact pins, and a disk arrangement is required between the fingers and the spring contact members, whereas Somers claim 5 recites that the fingers engage the spring contact members.
23. The A.C. version of the Struthers-Dunn #220 relay, illustrated by defendant’s exhibits 3 and 88, is basically the same as the D.C. version except that the can-type magnet of the D.C. relay has been replaced by a U-shaped magnet. The A.C. relays were developed and tested prior to 1952 and a working sample was delivered to the Air Force prior *493 to this date. In April 1952, 15 of these A.C. relays were delivered to the Air Force. While this relay, by using a U-shaped magnet, does eliminate one difference found between the D.C. version and Somers claim 5, the remaining differences in the contact structure and disk arrangement still exist.
24. In late 1949, the Federal Telephone and Eadio Corporation, hereinafter referred to as Federal, had a Signal Corps contract for the manufacture of retransmitters which required a sensitive relay. At first the sole source of supply was Sigma Instruments. Struthers-Dunn, Inc., having developed its #212 relay illustrated by defendant’s exhibit 61, submitted six such relays to Federal for testing. The testimony of George B. Conger, Jr., salesman for Struthers-Dunn, that he delivered six #212 relays to Federal in 1949 is corroborated by the testimony of Vernon G. Bailey, engineer of Federal at that time. At least one of the submitted relays was promptly tested in a retransmitter and was found to be satisfactory. Federal’s test engineer subjected the six relays to all the tests then required by the Signal Corps and found that the relays passed. On March 21, 1950, the Struthers-Dunn #212 relay was added to Federal’s drawing as an approved relay for retransmitters. Later, when Federal issued a new drawing, the Struthers-Dunn #212 relay was again listed as an approved item. Immediately after the approval by Federal, the sales manager of Struthers-Dunn approached Federal weekly in an effort to sell #212 relays. This attempt to sell from a sample before the factory was tooled to mass-produce the relay, was in accordance with the custom in the relay industry. All of the above acts with respect to the #212 relay occurred within the United States prior to July 1951. Later, when Struth-ers-Dunn received orders for the #212 relay, it started preparation for mass production in May 1952, and began relay production in early 1953.
25. Application of Somers patent claim 5 to the Struthers-Dunn #212 relay, defendant’s exhibit 61, is tabulated below with comments.

*494
Somers Claim 5

An electrical relay comprising (a)a supporting member,
(b) a U-shaped electromagnet carried by said member, said magnet comprising a pair of spaced substantially parallel opposing poles having free end portions extending toward and fixedly secured at one face of said supporting member,
(c) an armature rotatably mounted between the magnet poles on the same side of said supporting member as the magnet and extending at right angles to its axis of rotation with the ends of the armature extending toward the opposing magnet poles, *and said armature being substantially balanced about its axis,
(d) a plurality of pairs of terminals carried by the supporting member in the space between it and the armature,
(e) a plurality of spring contact members each of which is fixed at one end with respect to the supporting member and has its free end- extending between and being biased toward one of a pair of terminals, said contact members lying between the armature and the supporting member,
(f)fingers secured at opposite sides of the armature and extending toward the supporting member, each of said fingers being adapted to engage one of said spring contact members to move the latter into engagement with the other of said pair of terminals when the armature is rotated, * * *.

Struthers-Dunn #$12 relay

(a) the square member upon which the active parts of the #212 relay are mounted,
(b) the #212 relay has such an electromagnet fixedly secured to the supporting member (a),
(c) the #212 relay has such a rotatable armature between the magnet poles and on the same side of member (a) as the magnet and extending at right angles to its axis of rotation and toward the opposing magnet poles, and the #212 armature has a finger at one side of the armature balanced by added solder on the opposite side of the armature,
(d) the #212 relay includes a single pair of terminals carried by the member (a) and located between said member and the side of the armature,
(e) the #212 relay includes a single spring contact member fixed at one end with respect to the member (a) and has its free end extending between and being biased toward one of the pair of fixed terminals, and the #212 spring contact member is located between the side of the armature and the supporting member (a),
(f) the #212 relay includes a single finger secured to one side of the armature and extending toward the supporting member (a) and adapted to engage the single spring contact member to move into engagement with the other terminal of the single pair of fixed terminals when the armature is rotated.
*495 28. Comparison of the #212 relay with claim 5 of the Somers patent shows that there are two minor differences. The #212 relay has only a single switch mechanism, comprising a single pair of terminals, one spring contact member and one operating finger. Somers claim 5 recites a plurality of duplicate sets of switching mechanisms. The #212 relay has its armature on approximately the same level as the pair of, terminals and the spring contact member. Somers claim 5 recites the pairs of terminals and the spring contact members, being in the space between the armature and the support member. The first difference does not amount to a patenta ble distinction or improvement since it would have been within the purview of one having ordinary skill in the relay art to add a duplicate set of switching mechanisms to the relay to enable the relay to control additional apparatus. Viewing this difference in another light, duplication of a part from a known device in a subsequent device does not of itself make the subsequent device patentable. Similarly, the second difference also would not amount to a patentable distinction or improvement since it would be within the purview of one having ordinary skill in the relay art to raise the armature sufficiently to allow the pair of terminals and the spring contact member to be positioned more directly in the space between the armature and the support member. If it were desired to put more than one set of switching mechanisms on the relay, this would appear to be the most logical solution. This is especially true in view of the prior art as represented by the Cole patent, the Lazich patent, and both the A.C. and D.C. versions of the Struthers-Dunn #220 relay, which shows that it is old in the relay art to locate the terminals and spring contact members between the armature and the supporting member. The #212 relay provides terminals and a contact member between the side of the armature and the supporting base.
27. In late 1949 or early 1950, Struthers-Dunn was awarded a contract by the Air Force for the development of a sensitive relay. Pursuant to this contract, Struthers-Dunn developed a modification of the #212 relay, defendant’s exhibit 60. The contract under which this modified #212 relay was developed had the security classification of “Re *496 stricted” at least through February 1952, and there is no evidence that this classification was removed or that the relay was made available to the public prior to March 6, 1952, the date of invention established by plaintiff. The evidence does not support a finding that these modified #212 relays were actually reduced to practice prior to March 6, 1952. The modified version of the #212 relay was not a part of the prior art at the time of the alleged Somers invention.
28. Evidence was presented at trial of this case regarding a series of tests made in 1954 and 1955 comparing Somers type relays with other available relays. This evidence was not conclusive that the Somers type relays tested were actually constructed in conformity with the Somers patent disclosures. Even if it is assumed that said relays were in fact constructed in accordance with the Somers patent, the evidence concerning the test results was not conclusive as to the success or failure of Somers type relays. Evidence with respect to alleged commercial success of the Somers relay was inadequate to warrant a finding thereon.
29. The Lazich and Cole patents, the Struthers-Dunn #212 relay, and the #220 relays disclose features of the Somers patent claim 5 not disclosed in the prior patents cited by the Patent Office examiner against the Somers application for patent. The presumption of validity attaching to a patent issued by the Patent Office has been rebutted by the evidence presented in this case.
30. Summarizing findings 16 to 29 above, it is found that the Cole, Lazich, and Hall patents, and the Struthers-Dunn #212, #220 A.C. and #220 D.C. relays are prior art disclosures known by others in this country before the alleged invention by Somers of the relay defined in claim 5 of the patent in suit; that the differences between the Somers relay and the Struthers-Dunn #212 relay are not such as would amount to a patentable invention, and that claim 5 of the patent in suit is invalid.
INFRINGEMENT ISSUE
31. Defendant has admitted that during the 6-year period preceding the filing of the First Supplemental and Amended *497 Petition on July 26, 1961, defendant used at least one of the following 22 makes and models of rotary type relays (plaintiff’s exhibit number is indicated in parentheses):
a. Hi-G, Inc. Eelay Model No. HG-4S (PX 40).
b. Hi-G, Inc. Eelay Model No. 2SM-353G-2 (PX 29).
c. Hi-G, Inc. Eelay Model No. 4SL (PX 15).
d. Struthers-Dunn Eelay Model No. FC-6 (PX 22).
e. Allied Control Company Eelay Model No. KHJ-6D-26.5 (PX 12).
f. General Electric Company Eelay Model No. 3S2791-G200B9 (PX 6).
g. Hi-G, Inc. Eelay Model No. 2B-1D126 (PX 41).
h. Comar Electric Co. Eelay Model No. SM-151 (PX 30).
i. Kurman Electric Co. Eelay Model No. KX1P20 (PX 13)..
j. Iron Fireman Mfg. Co. Eelay Model No. 78GBON-4-:D-600 (PX33).
k. Union Switch & Signal Division, Westinghouse Air-brake Company, Eelay Model No. CS26HP2H (PX 2i).
l. Advance Eelays Division, Elgin National Watch Company Eelay Model No. MV2C-600D-11 (PX 14).
m. Filtors, Inc. Eelay Model No. P26A1J6A (PX 32).
n. Babcock Eelays, Eelay Model No. BE8-600B1-26V (PX 9).
o. Control Dynamics Eelay Model No. A25MJ732 (PX 31).
p. Amerelay Corporation Eelay Model No. A3A26.5 (PX 10)
q. Western Electric Co. Eelay Model No. GS57668 (PX 1).
r. Amerelay Corporation Eelay Model No. A4A26.5-4 (PX 10).
s. Allied Control Company Eelay Model No. KHY-6B-26.5 (PX 4).
t. Guardian Electric Mfg. Co. Eelay Model No. 1E1005P (PX 5).
u. Magnecraft Electric Co. Eelay Model No. W44HSX-105 (PX 42).
v. Branson Corporation Eelay Model No. AEB-2C-24A (PX 7).
32. The invention, if any, disclosed in the Somers patent is not a pioneer invention, in view of the crowded nature of the relay art cited by the examiner in the Patent Office, and cited by the defendant in this suit. During the prosecution *498 of the application before the Patent Office, the patentee through his attorney found it necessary to rely heavily on certain limitations recited in the claims to distinguish the claims over the prior art. For these reasons, the claims of the patent must be strictly construed.
33. Clause (b) of claim 5, as set forth in finding 14, recites that the opposing poles of the magnet have their “free end portions extending toward and fixedly secured at one face of said supporting member.” None of the following accused relays support the poles of the magnet at their free ends. Each of these relays provides support for the poles of the magnet at a point above the free ends. These accused relays do not infringe claim 5 of the Somers patent:
Advance Relays (Elgin National)— Model No. MV2C-600D-11
Allied Control Company-Model No. KHY-6B-26.5
Allied Control Company_Model No. KHJ-6D-26.5
Amerelay Corporation_Model No. A3A26.5
Amerelay Corporation_Model No. A4A26.5-4
Branson Corporation_Model No. AEB-2C-24A
Cómar Electric_Model No. SM-151
Control Dynamics_Model No. A25MJ732
Eiltors, Inc__ Model No. P26A1J6A
General Electric Company_Model No. 3S2791-G200B9
Guardian Electric_Model No. 1R1005P
Hi-G, Inc_Model No. 2B-1D126
Iron Fireman_Model No. 78GBON-4-D-600
Kurman Electric_ Model No. KX1P20
Magnecraft Electric_Model No. W44HSX-105
Union Switch & Signal_Model No. CS26HP2H
Western Electric_Model No. GS57668
34. Clause (f) of claim 5 of the Somers patent recites that the fingers be “secured at opposite sides of the armature and extending toward the supporting member.” The phrase “opposite sides” in this claim is ambiguous. The term “sides” could refer first, to sides of the armature with respect to the axis of rotation, or second, to sides as opposed to top, bottom, or ends, or third, to sides in the geometric sense in which the sides, top, bottom, and ends are all considered sides. Reference to the drawings of the patent in suit, which are reproduced above, is of no help since the drawings conform to all three of the above interpretations. Similarly, the specification of the patent is of no help, since the use of the phrase in the specification also lends itself to all three interpretations. In this light, it is proper to refer to the application file for clarification.
*499 35. As originally filed, application claims 8-11, subsequently canceled, each described the fingers as “a member secured to the armature at each side of said axis of rotation.” This clause encompasses the first meaning set forth in the preceding finding. Application claims 12 and 14, also subsequently canceled, contained similar language to point out that “sides” refers to sides of the armature with respect to the axis of rotation. When the aforementioned application claims were canceled after the first Patent Office action, application claims 16-22 were added. Application claims 17 and 19-21 described the fingers as resilient members secured one at each side of the armature. This clause is not quite as clear as the previous one, since it could refer to either the first or second meaning, i.e., sides with respect to the axis of rotation, or sides as opposed to top, bottom, or ends. Application claim 22 described the fingers as “fingers projecting outward and then parallel to said armatures from opposite faces thereof with ends extending at substantially right angles to said parallel portions of said fingers but in the same plane with said parallel portions.” This recital was clear since it said “faces” rather than “sides”, and it definitely falls within the second meaning set forth aboye. After the next Patent Office action, application claims 23 and 24 were substituted for claims 19,21, and 22. Claim 23 ultimately became claim 5 of the issued patent. Claim 24, which ultimately became claim 6 of the issued patent, described the fingers as “fingers projecting outwardly from opposite sides of the armature and then substantially parallel to the sides of the armature toward said blades.” This clause encompasses the second meaning set forth above, i.e., sides as opposed to top, bottom, or ends.
36. The application file indicates that when the applicant desired to refer to the first meaning, i.e., the opposite sides of the armature with respect to the axis of rotation, he used a clause which clearly set this intention out as in application claims 8-12, and 14. After application claims 8-12 and 14 were canceled, the applicant never referred to the location of the fingers in any manner which indicated that said first meaning was intended. The only subsequent claims which clearly indicate the meaning of the phrase used to describe *500 the location of the fingers on the armature were application claims 22 and 24 which use the second meaning. Application claim 24, now claim 6 of the patent in suit, is the only-claim other than claim 23, now claim 5 of the patent in suit, to use the phrase “opposite sides.” Since the meaning of the phrase “opposite sides” in claim 24 is clear, it appears that the same meaning was intended in application claim 23, filed at the same time as claim 24. It is found that the term “sides” as used in patent claim 5 refers to sides or faeés of the armature, as opposed to top, bottom, or ends of the armature.
37. None of the following accused relays have fingers secured to opposite sides of the armature as required in clause (f) of claim 5, but rather each of these relays has its fingers secured to either the ends, top, or bottom of the armature:
Amerelay Corporation_Model No. A3A2G.5
Amerelay Corporation_Model No. A4A26.5-4
■Babcock Belay_Model No. BR8-600B1-26V
Branson Corporation_Model No. ARB-2C-24A
Struthers-Dunn_Model No. FC-6
Union Switch_Model No. CS26HP2H
Western Electric_Model No. G-S57668
38. The following accused relays are found to contain each and every element and limitation of claim 5 of the Somers patent:
Hi-G Corporation_Model No. HG-4S
Hi-G Corporation_Model No. 2SM-353G-2
Hi-G Corporation_Model No. 4SL
39. Summarizing findings 31 through 38 above, the Hi-G, Inc. relays, Model Nos. HG-4S, 2SM-353G-2, and 4SL are found to infringe Somers patent claim 5, if it were valid, and each of the remaining accused relays is found not to infringe claim 5 of said patent.
CONCLUSION OR LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claim 5 of United States Letters Patent No. 2,718,568 is invalid. Judgment is entered to that effect, and plaintiff’s petition is dismissed.