**NORTH ELECTRIC COMPANY**

**v.**

**The UNITED STATES and Electronic Specialty Co., Successor to Iron Fireman Manufacturing Company, Intervenor-Defendant.**

**No. 292–60.**

United States Court of Claims.

Nov. 9, 1967.

John A. Dienner, Chicago, Ill., attorney of record, for plaintiff. Brown, Jackson, Boettcher & Dienner, Arthur J. Wagner, Chicago, Ill., Fred O. Buckhalter, Jamison, Ulrich, Hope, Johnson & Burt, Cleveland, Ohio, of counsel.

Joseph V. Colaianni, Washington, D. C., with whom was Acting Asst. Atty. Gen., Carl Eardley, for defendant.

James L. Dooley, Washington, D. C., attorney of record, for intervenor-defendant. Cushman, Darby & Cushman, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Donald E. Lane with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on July 19, 1966. Exceptions to the commissioner's opinion and report were filed by plaintiff, and the case has been submitted to the court on the briefs of the parties and oral argument of counsel for plaintiff and intervenor-defendant. Since the court is in agreement with the commissioner's opinion findings of fact, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. It is concluded that claims 3, 4, 7, 10, 13, and 17 of patent 2,767,280 are invalid and therefore plaintiff is not entitled to recover. The petition is dismissed.

### OPINION OF COMMISSIONER*

LANE, Commissioner: This is a patent suit under Title 28 U.S.C. § 1498, in which plaintiff seeks to recover reasonable and entire compensation for the unauthorized use or manufacture by or for the defendant of patented inventions. Plaintiff alleges infringement of claims 3, 4, 7, 10, 13, and 17 of U. S. Letters Patent No. 2,767,280 entitled "Relay Structure," and which issued to plaintiff October 16, 1956, based on an application filed in the U. S. Patent Office on April 29, 1952. Plaintiff is the owner by assignment of the entire right, title, and interest in the patent here in suit. The parties have agreed to defer any issue of accounting until the question of liability has been determined. The issues presently before the court are whether the patent claims in issue are valid and infringed. It is found that claims 3, 4, 7, 10, 13, and 17 are invalid for failure to define patentable invention as required by Title 35 U.S.C. § 103.

---

\* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

The invention disclosed in the patent in suit relates to small electrical relays that are statically and dynamically balanced to withstand the acceleration, shock, and vibration encountered in modern aircraft and missiles. An earlier patent case in this court relating to a balanced electrical relay construction was decided July 16, 1965. Connecticut Valley Enterprises, Inc. v. United States, 348 F.2d 949, 172 Ct.Cl. 468. Findings 5, 6, and 7 in that case, reproduced at 172 Ct.Cl. 477–479, note the general nature and development of electrical relays.

In 1949 personnel of plaintiff became aware of a need by the military for miniaturized relays that had improved performance characteristics. As part of a diversification program, Donivan L. Hall, then in charge of the electromechanical research and development for the plaintiff, was assigned the task of developing a relay that would satisfy the military's needs. Hall and his assistant, Howard C. Stanley, made several unsuccessful attempts before perfecting in the latter part of 1951 the relay described in the patent in suit which is hereinafter referred to as the Hall relay.

The Hall relay is constructed with all the moving parts symmetrically balanced about its three axes. The Hall relay comprises a pair of parallel cylindrical electromagnets having poles extending vertically therefrom. An armature is rotatably mounted between the poles and has its axis of rotation parallel with and equidistant from the axes of the poles. A contact-actuating member having arms is mounted to the armature. The extremities of the arms engage the free ends of vertical spring contact blades or levers having electrical button contacts mounted thereon. Stationary contacts are mounted adjacent the button contacts. When the electromagnets are energized, the poles attract and slightly rotate the armature thus rotating the actuating member. The actuating arms move the contact blades so that the button contacts engage selected stationary contacts to connect selected electrical circuits. After the initial engagement of the electrical contacts the armature and actuating member continue rotary movement thereby flexing the ends of the contact blades in relation to the engaged stationary contacts to further increase the physical pressure between the engaged contacts. The continued movement of the contact blades is referred to as "overtravel."

The balanced relationships of the movable components minimize the effects of acceleration, shock, and vibration on the operation of the Hall relay. The overtravel of the spring contact blades provides an additional safety factor to minimize the possibility of the disengagement of the contacts.

The invention is defined in its broadest scope by patent claim 3 which reads as follows:

### Patent Claim 3

In a statically and dynamically balanced relay structure,

a pair of pole members disposed in a given plane with the longitudinal axes thereof disposed in parallel relation,

an armature mounted for movement about its central pivotal axis with the application of given forces by said poles on opposite sides of said armature and equidistant from said pivotal axis,

a balanced actuating member associated with said armature extending generally transversely thereof,

and contact carrying members disposed on opposite sides of said armature for operation into engagement with cooperating fixed contact members by said actuator means,

said contact carrying members having longitudinal axes disposed in parallel alignment with the longitudinal axes of said pole members.

Patent claim 4 specifies contact sets including longitudinal levers having their axes in a plane intersecting the plane of the pole axes and that the armature axis is located on the line of intersection of the planes. Claim 7 limits the stationary electrical contacts to the set screw type.

Claim 10 recites that the major horizontal axes of the relay are disposed along the diagonals of a rectangular can enclosure. Claims 13 and 17 include the "overtravel" feature of the blade or contact-carrying levers.

The patent laws provide that a patent issued by the United States Patent Office is presumed valid and that the burden is upon the alleged infringers, the defendants in this suit, to prove otherwise. Title 35 U.S.C. § 282.

The defendants contend that the invention recited in the patent claims in issue is unpatentable under 35 U.S.C. § 103 which in substance provides that the invention taken as a whole must be unobvious to a person having ordinary skill in the art to which the invention relates at the time the invention was made in order to be patentable.

The Supreme Court in the recent decision of Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, stated:

> * * * Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. * * *

It is generally conceded that hindsight is always better than foresight. In determining whether an invention was unobvious when made, the prior art must be viewed prospectively and not retrospectively using the patent as a blueprint to reconstruct the invention by indiscriminately picking and choosing parts and bits from the prior art.

To support the contention of obviousness, the defendants have directed the court's attention to 11 prior art patents, none of which singly anticipates the invention defined in the patent claims in issue. Said patents are identified in finding 11.

The most pertinent prior art disclosure is Ashworth patent 2,510,305, cited by the patent examiner and defendants' exhibit 2 herein. It shows a balanced relay in which an armature is rotatably and diagonally mounted between two vertically mounted electromagnetic poles so that when the two electromagnetic elements are energized the poles will attract and rotate the armature about the central axis of the relay. Actuating arms are attached at an angle to the ends of the armature. The ends of the arms engage the free ends of contact-carrying blades vertically mounted so that as the armature rotates the actuating arms move the blades to engage adjacent flexible contact fingers. The armature and arms continue to rotate *beyond* the initial engagement to the electrical contacts to flex the adjacent contact fingers to increase the pressure between the engaging contacts. The main distinctions between the Ashworth patent relay and the Hall patent relay are that the Ashworth relay does not have a *single* actuating member mounted transverse to the armature at the *central* axis of rotation, and that the relay switch structure of the Ashworth patent has *spring biased* electrical contacts instead of *stationary* electrical contacts.

The problem before Hall was to develop a minaturized relay that was unaffected by shock, vibration, and acceleration, and which would fit within a container having dimensions of 1" X 1" X 1¾" with the terminals extending from one end. The problem itself suggests in view of the Ashworth patent that to efficiently utilize the available space the major horizontal axes of the relay should extend along the diagonals of the square cross section of the enclosure. It is clear that it would be obvious in reducing the size of the Ashworth relay to aline the poles along one diagonal of the rectangular cross section, to connect the actuating arm at the center of rotation and along the other diagonal, and to position

the switch mechanisms accordingly. This is true in view of the actuation arm shown in Fig. 5 of the Skrobisch patent 2,422,861, defendants' exhibit 1. The switch mechanism of the Ashworth relay is similar to that of the Hall relay in that the actuating arms and blades continue to move after the first engagement of the electrical contacts to increase the physical contact pressure. The Lazich patent 2,775,666, defendants' exhibit 10, filed more than 1 year prior to the patent in suit but not cited by the patent examiner, discloses the use of a similar type switch mechanism as that of the Hall relay in an extremely small relay that is capable of withstanding vibration and shock. It is concluded that it was within the ordinary skill of one skilled in the relay art to substitute the switch structure disclosed in the Lazich patent for the switch structure of the Ashworth patent. It was also obvious to use set screw type adjustable electrical contacts as shown by the Petersen patent 2,494,-308, defendants' exhibit 6. The pertinent prior art references are of the late 1940's and 1950's and relate to the developing relay art concerned with small relays that are statically and dynamically balanced.

■ In order for the "secondary consideration" of commercial success to be given much weight in determining whether an invention was unobvious, the sales figures of the patented device must be related either directly or indirectly to the relevant market. The fact that plaintiff had relay sales of $8,787,200 between 1952 and 1964 falls short of establishing facts upon which an inference can be drawn of a wide acceptance of the Hall patent relay based upon the merits of the invention embodied therein. Further, the fact that plaintiff granted a patent license under the patent in suit is not sufficient by itself without evidence of the terms and conditions of the license agreement to indicate that the licensee was motivated by respect for the patentee's legal rights. If the license royalties are nominal it indicates that it may have been more economical for the li-censee to pay than to contest the validity of the patent. Kleinman v. Kobler, 230 F.2d 913, 914, (2d Cir.), cert. denied, 352 U.S. 830, 77 S.Ct. 44, 1 L.Ed.2d 51 (1956).

■ The strongest "secondary" indication that the invention might have been unobvious is the fact that the intervenor-defendant substantially copied the Hall relay in its manufacture of the accused relays used by the Government. This fact by itself unsupported by evidence that the intervenor-defendant attempted to develop such a relay in 1951 or soon thereafter is not sufficient to infer that it was unobvious to the intervenor-defendant to make such a relay in 1951. The "secondary" evidentiary threads presented by the plaintiff are found not sufficient to weave a pattern strongly supporting the proposition that the invention defined in the patent claims in issue were unobvious to those skilled in the relay art at the time the invention was made.

■ It is concluded from all the evidence, with due respect given to the proceedings before the Patent Office, that the invention defined in the claims 3, 4, 7, 10, 13, and 17 of the patent in issue was but an obvious extension of the prior art. Therefore, said patent claims are found to be invalid for failure to define a patentable invention as required by Title 35 U.S.C. § 103.

Since the patent claims in issue, are invalid, the defendant is relieved of any liability for the use by the defendant of the accused relays.

It is recommended that plaintiff's petition be dismissed.

### FINDINGS OF FACT

1. This is a patent suit brought under tiff seeks to recover reasonable and entire compensation for defendants' unauthorized use of a patented invention. Plaintiff filed its petition on July 25, 1960, alleging that certain electrical relays used by the Government infringe United States Letters Patent No. 2,767,-280 entitled "Relay Structure." Said patent issued to the plaintiff October 16, 1956, based on a patent application filed

in the United States Patent Office on April 29, 1952, by Donivan L. Hall, Howard C. Stanley, and Lloyd Bender. During the prosecution of the patent application Bender was removed as a co-inventor.

2. Plaintiff, North Electric Company, is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 553 South Market Street, Galion, Ohio. Plaintiff is an established manufacturer of various items of telephone equipment, including relays for use in telephone circuits. Plaintiff has held all right and title in and to the patent in suit since its date of issue.

3. On February 23, 1961, the intervenor-defendant, Iron Fireman Manufacturing Company, a corporation organized under the laws of the State of Oregon, and having a place of business in Cleveland, Ohio, filed a motion under Rule 24 to intervene as a party defendant. During the 6 years prior to the institution of this suit the intervenor-defendant manufactured and sold to the Government the electrical relays which plaintiff alleges infringe its patent here in suit.

4. The parties agreed at pretrial to defer any question of accounting until the issue of liability has been determined. The issues presently before the court are whether patent claims 3, 4, 7, 10, 13, and 17 of the patent in suit define a patentable invention, and whether the accused electrical relays embody the invention defined in said patent claims.

5. An electrical relay is an electromagnetic device which when activated by electrical current causes the actuation of one or more electrical switches for the purpose of connecting or disconnecting electrical circuits. The subject matter disclosed and claimed in the patent in suit relates to small relays that are statically and dynamically balanced for use in electrical equipment that is subjected to acceleration, shock, and vibration forces and extreme temperature ranges.

6. In 1949 it came to the attention of plaintiff's sales and technical personnel that the Government was having problems with certain relays and in particular that Collins Radio Corporation, in performance of a military contract, had need for a special hermetically sealed relay tha that was small in size (1″ X 1″ X 1¾″) and that would meet rigorous military specifications. As part of a diversification program, Donivan L. Hall, who was then in charge of electromechanical research and development for the plaintiff, was given the task of designing such a relay. The initial attempts by Hall and his assistant, Howard C. Stanley, were unsuccessful, as not only did the relay have to be very small but it had to withstand a high degree of mechanical shock and vibration while having electrical performance characteristics of larger relays. The need for a relay of this type became acute as the Radio Corporation of America had built equipment for the Strategic Air Command which was inoperable because of relay failures. In 1951 Hall and Stanley developed the relay that is described in the patent in suit. At first they did not have the necessary testing equipment so samples were prepared for testing by the customer. The relay was approved as meeting the specifications and soon thereafter became a commercially successful device. On April 29, 1952, a patent application was filed and, after protracted prosecution, the patent in suit issued on October 16, 1956.

7. James G. Bonnar, an executive for the plaintiff, testified that the plaintiff had relay sales of $8,797,200 in the period of 1952 to 1964. The evidence is not clear whether such sales information pertains exclusively to electrical relays defined in the patent in suit or whether it also includes other types of electrical relays manufactured by the plaintiff. Bonnar further testified that the plaintiff granted a patent license agreement to Phillips-Eckardt Electronic Corporation under the patent in suit and entered into an agreement with the Elgin National Watch Company releasing the latter from alleged past patent infringement. The terms and conditions of the license

and release agreements are not matters of record.

8. The relay disclosed in the patent in suit, plaintiff's exhibit 19, is constructed with all the moving parts balanced about all three axes of the relay. The basic arrangement of the armature, the contacts, and the actuator is shown in Fig. 7 of the patent drawings. The armature 54 is mounted for rotational or oscillatory movement about a central axis on a pivot 56 with the application of the magnetic forces from the electromagnetic poles 24 and 26 at the ends of the armature 54 equidistant from the central axis. The armature 54 is biased away from the poles by springs 60. A contact actuator having two arms 100 is fastened to the armature 54 and the arms extend transverse thereto terminating in finger portions 106 that engage vertical spring contact-carrying levers or blades 74. Stationary electrical contacts 69 and 71 are mounted adjacent each blade 74. An alternative embodiment is shown in Fig. 9 of the patent drawings in which the stationary or fixed electrical contacts 69 and 71 are replaced with adjustable set screw type contacts 369 and 371.

9. Upon energizing coils 20 and 22, a magnetic path is established through the poles 24 and 26, the bottom strap 46, and the armature 54. The ends of the armature 54 are attracted to the poles 24 and 26 thus rotating the armature 54 about the pivot pin 56. As the armature rotates, the contact actuating arms 100 move the blades 74 and the contacts 72 mounted thereon so that one of the contacts 72 disengages with fixed contact 71 and the other contact 72 engages fixed contact 69. The armature continues to rotate causing the actuating arms 100 to bend or flex the blades 74 to an overtravel position to insure pressure engagement of the contacts and to maintain engagement despite any shock forces received by the relay. When the coils 20 and 22 are deenergized, springs 60 urge the armature 54 to rotate in the opposite direction to disengage contacts 72 and 69 and to reengage contacts 72 and 71. Because of the balanced relationship of the movable components, the effects of acceleration, shock, and vibration on the operation of the relay are greatly reduced. Furthermore, the overtravel of the blades 74 provides an additional safety factor to minimize the possibility of the disengagement of the contacts.

10. Plaintiff has placed in issue claims 3, 4, 7, 10, 13, and 17 of the patent in suit. Patent claim 3 is the broadest in scope and reads as follows:

### Patent Claim 3

In a statically and dynamically balanced relay structure,

a pair of pole members disposed in a given plane with the longitudinal axes thereof disposed in parallel relation,

an armature mounted for movement about its central pivotal axis with the application of given forces by said poles on opposite sides of said armature and equidistant from said pivotal axis,

a balanced actuating member associated with said armature extending generally tranversely thereof,

and contact carrying members disposed on opposite sides of said armature for operation into engagement with cooperating fixed contact members by said actuator means,

said contact carrying members having longitudinal axes disposed in parallel alignment with the longitudinal axes of said pole members.

Patent claim 4 specifies contact sets including longitudinal levers having their axes in a plane intersecting the plane of the pole axes and that the armature axis is located on the line of intersection of the planes. Claim 7 limits the stationary electrical contacts to the set screw type. Claim 10 recites that the major horizontal axes of the relay are disposed along the diagonals of a rectangular can enclosure. Claims 13 and 17 include the "overtravel" feature of the blade or contact-carrying levers.

11. Defendants contend that the invention defined in the patent claims in issue is unpatentable in view of the prior

852

art existing at the time the invention was made. In support of this contention, the defendants cite the following 11 prior patents:

### U. S. Patents

| | | |
|---|---|---|
| Goodrum .................................... | 808,834 | 1906 |
| Creveling ................................... | 963,996 | 1910 |
| Cummings .................................. | 1,624,476 | 1927 |
| Mead ....................................... | 1,763,003 | 1930 |
| Snavely ..................................... | 2,140,604 | 1938 |
| Skrobisch .................................. | 2,422,861 | 1947 |
| Cole ........................................ | 2,428,784 | 1947 |
| Petersen ................................... | 2,494,308 | 1950 |
| Ashworth .................................. | 2,510,305 | 1950 |
| Lazich ...................................... | 2,775,666 | 1956 |

[filed April 29, 1952]

### Foreign Patent

| | | |
|---|---|---|
| British .................................... | 572,686 | 1945 |

The Creveling, Cummings, Mead, Petersen, Ashworth, and British patents were cited against the Hall application by the patent examiner. The defendants principally rely upon the Ashworth and Skrobisch patents in view of the Petersen, Cummings, Lazich, Snavely, and Goodrum patents. None of the prior art patents singly anticipates the invention defined in the patent claims in issue.

12. The most pertinent prior art reference is the Ashworth patent cited by the patent examiner. The Ashworth patent, defendants' exhibit 2, relates to an electrical relay having a balanced armature mechanism for application in an environment where the relay is subjected to shock and vibration. The relay, as shown in Fig. 1 of the patent drawings, comprises a pair of electromagnetic coils having poles 6. An armature 10 is rotatably and diagonally mounted intermediate the poles 6. Arms or driving members 17 are attached to the ends of the armature 10 and engage vertically mounted spring contact fingers or blades 19 shown in Fig. 4 of the patent drawings. The spring blades 19 are positioned between pairs of spring electrical contact fingers 22b and 22f. When the coils 7 are energized the armature 10 is attracted by poles 6 causing the armature to rotate. As the armature rotates, the arms 17 move the blades 19 from engagement with the spring contact fingers 22b into engagement with contact fingers 22f. As the armature continues to rotate, the arms 17 further move blades 19 increasing the electrical contact pressure with contact fingers 22f causing contact fingers 22f to flex to the right as shown. When the coils are deenergized the armature rotates in the opposite direction by the resilient force of springs 14, blades 19, and fingers 22f to disengage blade 19 and contact fingers 22f and reengage blades 19 with contact fingers 22b. The Ashworth patent does not show stationary electrical contacts straddling the spring blades 19, nor does it show a single balanced actuating arm extending transversely through the central axis of the relay, set screw contacts, coils alined along one diagonal of a rectangular enclosure, and the actuating member along the other diagonal, nor flexing the contact blades 19 with respect to a stationary contact in an overtravel manner.

13. The Skrobisch patent, defendants' exhibit 1, relates to electrical relays having a dynamically balanced armature mechanism minimizing the effect of shock and vibration. It discloses in the

patent drawings a single coil C surrounding a core 16. The lower end of the core 16 branches into 2 pole pieces 20 and 22 both having the same magnetic charge, whereas the poles of the Hall relay have opposite charges. A balanced armature A is rotatably and diagonally mounted between the ends of the pole pieces 20 and 22. A contact bar 66', shown in Fig. 5 of the patent drawings, is transversely mounted to the armature A with electrical contacts 68 mounted on its ends. Stationary contacts 72 are mounted adjacent to the contacts 68 so that when the coil C is energized the pole pieces magnetically attract the ends of the armature to rotate the armature and the contact bar 66' to engage electrical contacts 68 with the stationary electrical contacts 72 thus closing an electrical circuit. The Skrobisch patent does not show a pair of pole or pole members in the same context as that described in the patent in suit, nor does it disclose a flexible lever engaged by the bar 66' or a flexible contact-carrying blade that is subjected to overtravel in relation to the fixed or stationary contacts, electrical contact sets disposed on opposite sides of the armature, or set screw type stationary electrical contacts, nor does it show a rectangular enclosure.

14. The Petersen patent, defendants' exhibit 6, relates to a balanced relay in which the armature is balanced about its pivot point but where the pivot point does not lie in the vertical plane passing through the longitudinal axis of the coils and cores. The relay described in the Petersen patent is not a dynamically balanced relay. The relevant feature shown in the Petersen patent is the spring contact mechanism. An arm 9 projecting from the armature engages a spring blade 11 carrying electrical contacts. Adjacent the blade 11 is a set of set screw type stationary electrical contacts. When one of the coils is energized its corresponding core attracts one end of the armature rotating the armature to pivot the arm 9 causing the blade 11 to bend and move its contact into engagement with one of the set screw contacts 13.

The Petersen patent does not specifically state whether the arm 9 continues to move the spring blade 11 toward the stationary contact in an overtravel manner.

15. The Lazich patent, defendants' exhibit 10, application filed April 1951, relates to small hermetically sealed relays that are "capable of withstanding severe shocks and temperature changes." The relevant feature taught is the spring contact mechanisms, best shown in Fig. 3 of the patent drawings, in which one end of movable contact spring 49 is rigidly mounted and the free end extends between two stationary contacts 47. Electrical contact buttons 51 are mounted on the contact spring 49 adjacent the fixed contacts 47. The free end of the contact springs is engaged by the upturned sides 41 of a rotatable spider 35. When the relay is energized the spider moves to bend or flex the contact springs to engage contact buttons 51 with the stationary contacts 47, thereby completing electrical circuits. The spider 35 continues to move after initial engagement is made between the electrical contacts to further bend or flex the contact springs 49 to increase the contact pressure between the electrical contacts. This continued movement by the spider and the contact springs is termed overtravel.

16. The Cummings, Snavely, and Goodrum patents are only cumulative in nature for they add nothing that has not already been disclosed and discussed in the Ashworth, Skrobisch, Petersen, and Lazich patents. Furthermore the Cummings, Snavely, and Goodrum patents are not particularly pertinent because they are not concerned with miniaturization or with statically and dynamically balanced relays.

17. The principal question is whether it was obvious to one skilled in the electrical relay art in the latter part of 1951 and the early part of 1952 to combine the prior art disclosures in the manner recited in the patent claims in suit. It is found that the Ashworth, Skrobisch, Petersen, and Lazich patents pertain to the same art as the patent in suit. During cross-examination patentee Hall stat-

ed that in 1951 he was not particularly well versed with the prior art but that he was familiar with the telephone relays that were manufactured by the plaintiff. The problem that faced Hall was to design a miniaturized relay that would fit in a 1″ x 1″ x 1¾″ rectangular enclosure with all the external connections to be made at one end and a relay that would withstand vibration, acceleration, and shock. The problem itself suggests that in order to make efficient use of the available space the major horizontal axes of the relay should extend along the diagonals of the square cross section of the enclosure. The two main distinctions between the relay shown in the Ashworth patent and the relay defined in the claims in issue is that the Ashworth patent does not disclose a single actuating arm traversing the armature at the central axis of the relay and that the electrical contact members are structurally different. It is found that it would have been obvious to connect the arms 17 of the Ashworth patent to the armature at the pivot point of the armature to form a single actuator and to position the switch mechanism accordingly. This is particularly evident in view of the single actuation arm 66′ shown in the Skrobisch patent. The switch mechanism of the Ashworth patent is very similar to that claimed in the patent in suit in that it recognizes the value of moving the actuating arm beyond the point where the electrical contacts first engage to increase the contact pressure. The Ashworth relay permits the contact members 22f to flex during the overtravel of the actuating arm, whereas the Hall relay has fixed contacts 69 and the contact spring blades 74 flex in relation to the fixed contacts 69 after the initial engagement to increase the contact pressure. The Lazich patent discloses a contact spring 49 fixed at one end and having contact buttons mounted thereon adjacent the stationary passive contacts. The free end of the spring 49 is actuated beyond the mere engagement of the contacts in order to increase the contact pressure. Lazich teaches that this type of switch structure may be used in an extremely small relay that is capable of withstanding vibration and shock. It is found that it was within the ordinary skill of one skilled in the relay art who was familiar with the pertinent prior art to substitute the type of switch structure disclosed in the Lazich patent for the switch structure of the Ashworth patent. It is further found that it was obvious to use set screw type stationary contacts as shown in the Petersen patent. The pertinent prior art disclosures are of the late 1940's and early 1950's and correspond with the developing art particularly with the need for statically and dynamically balanced relays that were small and were capable of withstanding vibration and shock encountered by airborne equipment. It is found that the invention defined in Hall patent claims 3, 4, 7, 10, 13, and 17 taken as a whole was an obvious extension of the prior art. Therefore, said patent claims are invalid for failure to define a patentable invention under Title 35 U.S.C. § 103.

18. Plaintiff alleges that certain relays manufactured and sold by the intervenor-defendant to the Government and used by the Government infringe the patent claims in issue. Particularly the plaintiff alleges that relays designated as Type R400-1-B which includes model R400-1-B-8K (plaintiff's physical exhibit 8) and model R400-1-B-5K (plaintiff's physical exhibit 9) embody the invention defined in the patent claims in issue. The principal distinction between the two models is that the relay identified as plaintiff's exhibit 8 has an actuation arm in which the extremities are bifurcated to straddle the free end of the spring contact blade whereas the relay identified as plaintiff's exhibit 9 does not have a bifurcated actuation arm and engages the free end of the spring contact blade only on one side. This distinction is not significant in this suit since the patent claims define an actuating member that is generic to both structures.

19. The intervenor-defendant was granted U.S. Letters Patent 2,881,281 on

April 7, 1959, based upon a patent application filed in July 1956 by A. E. Sprando, plaintiff's exhibit 26. The R400–1–B relays are made substantially in accordance with the Sprando patent. It is readily apparent that the relay shown in the Sprando patent is very similar to the relay disclosed in the Hall patent in suit. Upon close analysis it is evident that the Sprando patent describes certain improvements or modifications that are made to the Hall relay. The principal distinction concerns the positioning and function of the spring contact blade. Fig. 2 of the Sprando patent shows the spring contact blade 46 initially positioned at a slight angle from vertical. The spring contact blade 46 performs two main functions: first, that of a flexible spring contact-carrying member that is flexed or bent by the actuating arm 53 to move button contact 47 into engagement with stationary contact 42, and second, that of a spring biasing member to act against the actuating arm so that when the relay is deenergized the spring blade will rotate the actuating arm 53 and armature 23 back to their original positions. The performance of the latter function enables the designer to delete other armature biasing members such as springs 60 shown in the Hall patent in suit.

20. The relay disclosed in the Sprando patent and the relays identified as plaintiff's exhibits 8 and 9 literally embody every element and limitation recited in the patent claims in issue except there is a question whether spring contact blades 46 in the accused relays have "longitudinal axes disposed in parallel alinement with the longitudinal axes of said pole members." It can be seen that during the operation of the relay the spring contact levers assume vertical positions in parallel alinement with the axes of the pole pieces to perform the same function and in the same manner as the spring contact blades defined in the patent in suit. The fact that the spring contact blade of the accused relays performs an additional function does not mitigate the fact that it also performs the same function as the contact levers or contact-carrying members defined in the patent in suit. It is found that the accused relays embody the invention defined in the patent claims in issue and that the plaintiff need not rely upon the doctrine of equivalents to substantiate its allegation. Therefore, it is found that *if* the invention defined in the Hall patent claims in issue is patentable, then the accused relays infringe said patent claims.

21. Summarizing the above findings of fact, it is found that claims 3, 4, 7, 10, 13, and 17 of the patent in suit are invalid for failure to define a patentable invention under Title 35 U.S.C. § 103, and that if said patent claims do define a patentable invention then the accused relays (R400–1–B) infringe said claims.

## CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 3, 4, 7, 10, 13, and 17 of patent 2,767,280 are invalid and that plaintiff is not entitled to recover, and judgment will be entered to that effect and therefore plaintiff's petition is dismissed.